FIRST NAT. BANK OF AMARILLO et al. v. RUSH. (No. 54–2733.)

(Commission of Appeals of Texas, Section B. April 2, 1919.)

1. APPEAL AND ERROR ⏀927(7)—REVIEW—DIRECTING VERDICT—EVIDENCE.

In considering whether the giving of a peremptory charge in favor of plaintiff was proper, only the evidence of defendant is to be considered, and, if sufficient to authorize a finding in his favor, giving of charge must be held improper, even though all of such evidence was controverted.

2. EVIDENCE ⏀448 — CONSTRUCTION — PAROL EVIDENCE.

Although a contract of partnership or joint adventure standing alone was unambiguous, parol evidence was admissible to show that sums recited to be paid therein and things recited to have been done were not in fact true, and to clarify uncertainty arising by reason of such recitation.

3. JOINT ADVENTURES ⏀5(3) — ABANDONMENT OF CONTRACT—JURY QUESTION.

In action involving contract whereby parties were to divide profits arising from purchase and sale of certain land, whether such contract was abandoned *held* for jury.

4. JOINT ADVENTURES ⏀4(1)—RESCISSION OF CONTRACT.

Under an executory contract for a joint adventure, where a member after agreeing to furnish the necessary money failed to do so, the other member might treat contract as abandoned.

5. PARTNERSHIP ⏀267 — DISSOLUTION — ABANDONMENT—FAILURE TO PAY MONEY.

The mere failure of a partner to pay money into the partnership under a partnership agreement will not work a forfeiture of his interest and a dissolution of the partnership, but abandonment may be implied from acts and conduct of the parties inconsistent with an intention on their part to continue the contract, especially in regard to contracts executory in their nature where little has been done toward their performance.

6. BANKS AND BANKING ⏀180—LOANS TO OFFICERS AND STOCKHOLDERS.

A bank with the knowledge of all of its officers could properly make a loan to a partnership of which its president, a large stockholder, was a member.

7. PARTNERSHIP ⏀340 — ACCOUNTING — DIVISION OF PROPERTY—SALE OF NOTES AND ACCOUNTS.

In the settlement of partnership affairs, uncollected notes and accounts should not be treated by the court as money and charged to either party, but the court should provide for the collection or sale of the notes.

Error to Court of Civil Appeals of Seventh Supreme Judicial District.

Suit by the First National Bank of Amarillo against J. W. Rush, in which W. H. Fuqua intervened. There was a judgment of the Court of Civil Appeals reversing a judgment in favor of plaintiff (160 S. W. 319, 609) and plaintiff and intervener bring error. Judgment of Court of Civil Appeals affirmed.

W. F. Ramsey, of Dallas (Reeder & Dooley, and Madden, Trulove & Kimbrough, all of Amarillo, of counsel), for plaintiffs in error.

H. H. Cooper, of Houston, J. A. Stanford, of Waco, and L. C. McBride, of Dallas, for defendant in error.

MONTGOMERY, P. J. This suit was instituted by the First National Bank of Amarillo (hereinafter for convenience designated as the bank) on the 16th day of March, 1910, against J. W. Rush and Mattie E. Rush, his wife.

The plaintiff alleged that the defendant had on the 24th day of March, 1906, executed and delivered to it a promissory note for $12,000, payable on demand and bearing interest at 10 per cent., and providing for 10 per cent. attorney's fees. The bank sought a judgment for the amount of the note, interest, and attorney's fees, and also a foreclosure on certain notes executed by one Gid Jowell to defendant J. W. Rush of the face value of $20,000, which the bank alleged had been pledged to it as collateral to secure the notes sued on. The defendant Rush answered and admitted the execution of the note and pleaded payment in full thereof, setting out the several items of the alleged payment with the dates thereof. The defendant Rush also claimed ownership of the collateral notes and sought a judgment for their possession. On January 13, 1911, W. H. Fuqua intervened in the suit, and among other things alleged that in the year 1904 intervener and defendant Rush entered into a partnership for the purpose of buying and selling cattle; that under the terms of the partnership the intervener was to furnish the necessary money and the defendant Rush pasturage for the cattle, and also to give the business his personal attention; and that the intervener should first be reimbursed for the money advanced by him without interest, and all profits divided equally between the parties.

⏀For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Intervener alleged that the cattle copartnership was in force on March 24, 1906, and that on that day the intervener and defendant entered into a copartnership agreement for the purchase and sale of a section of land in Swisher county, which contract was in writing, and was as follows:

"This memorandum of agreement, made and entered into by and between W. H. Fuqua of Potter county, Texas, and J. W. Rush of Swisher county, Texas, witnesseth:

"That the said J. W. Rush has purchased a certain section of land situated in Swisher county, Texas, and described as follows: Being section No. 27, block W–1 in Swisher county, Texas, being the section of land just east of the town of Tulia, Swisher county, Texas, for the consideration of $9,600 cash; and the said W. H. Fuqua has paid $9,600.00, being the purchase price of said land, for the said Rush.

"In consideration of the premises, the said Rush is to handle said section of land and to dispose of the same to the best advantage possible and is to pay the said Fuqua back the $9,600.00, so paid by him as above set out, without interest and is to further pay the said Fuqua two thirds of all the profits made on said section of land over and above the said $9,600.00 paid for same, as aforesaid; the said Rush to have and be entitled to the other one third of the profits made on said lands, if any.

"The said Fuqua hereby agrees not to charge any interest on the $9,600.00 advanced by him to the said Rush and invested in the above described lands, but is to have, when said lands are sold, the said $9,600.00 back together with two thirds of the profits on the same.

"We, the said W. H. Fuqua and J. W. Rush, hereby bind ourselves, our heirs, executors and administrators to carry out the terms of this contract.

"In testimony whereof we have signed our names, this the 24th day of March, 1906.

"[Signed] W. H. Fuqua.
"J. W. Rush."

The intervener further alleged that, pursuant to this contract and before the execution thereof, the defendant Rush drew a check on the bank to pay 10 per cent. of the purchase money for said land, and the intervener, who was president and actively in charge of the affairs of the bank, procured said check to be cashed, and that after the execution of the contract the deed was made to defendant and by his direction sent to the bank, and that the intervener procured said bank to pay the balance due for said land. The total price for the land was $9,-600.

Intervener further alleged that all the partnership business, both as to the land and the cattle, was conducted in the name of J. W. Rush and all the money for said partnership was furnished by the intervener by causing the bank to pay checks drawn by Rush on the bank, which checks were charged on the books of the bank to J. W. Rush, and that Rush knew all the facts and accepted the same as a compliance by intervener with his obligation to furnish the necessary funds.

Intervener further alleged that as cattle were sold the proceeds of such sale were remitted to the bank and by Fuqua's direction deposited in an impersonal account called "Fuqua-Rush Cattle Account," and as the lands were sold the proceeds were deposited in the bank by the direction of Fuqua to "Fuqua-Rush Land Account."

The plea of intervention set out various sums of money alleged to have been furnished, as above specified, and also alleged the several sums deposited in the cattle account and the land account and set up various other matters connected with the two alleged partnerships for the purpose of showing the condition of said partnerships.

It was alleged that the collateral note upon which a foreclosure was sought was the property of the land partnership, and that the note sued on by plaintiff was a liability of the partnership, although executed in the name of J. W. Rush, and that the payments alleged by defendant Rush to have been made to the bank on the note sued on were partnership funds, and that same were not payments on the note sued on, and that said payments were properly applied to overdrafts which had been incurred by Rush drawing checks on the bank, and which were charged to his account. Intervener sought a dissolution of and winding up of the affairs of both partnerships, and prayed that Rush be required to pay the note sued on out of partnership assets alleged to be in his possession, and for other relief.

The defendant Rush replied to the plea of intervention by exceptions and general denial. He also alleged and claimed in substance that, after the execution of the contract for the purchase of the land, the intervener failed and refused to advance the money in payment for same, and that by mutual consent the contract was in fact abandoned and rescinded.

The bank by supplemental petition denied the allegations of the defendant's answer, and especially pleaded that the payments alleged to have been made by defendant were not applied on said note, and that there had been no direction to apply same on the note, and that the defendant at the time of making such payments gave no directions as to the application thereof, and that the said alleged payments were in fact deposited by plaintiff and Fuqua in the bank as cash deposits and by request of Fuqua were carried in impersonal accounts as pleaded by Fuqua, and that the bank received said funds to be held pending a settlement of the partnership affairs between Fuqua and Rush and subject to such disposition as they might agree upon or as might be directed by Fuqua and subject to its right to apply same to the discharge of any balance in its favor that might be standing on its books on the J. W. Rush account, except interest which

Fuqua was to pay personally, and further alleged that some of the items on said account were for checks drawn by Rush for his individual business and not connected with the partnership business, and such items were to be charged to and paid by J. W. Rush. The bank further alleged: That by procurement of Fuqua, who was the owner of all its capital stock except director's shares, the defendant Rush was permitted to draw funds from the bank for the purpose of carrying on the land and cattle business, and that under such arrangement Rush drew various checks which it paid, and that some of the checks were for the personal use and benefit of Rush, of which, however, plaintiff had no notice at the time same were paid, and that at the time the notes sued on were executed there was a balance of overdrafts standing on its books against the defendant Rush for about $14,000, and it was expected and understood that Rush would continue to draw checks on the plaintiff and become indebted to it otherwise, and that the note was executed and delivered by the defendant and accepted by plaintiff to be credited to J. W. Rush on his account for the purpose of absorbing the overdraft, which then stood on plaintiff's books against Rush, and the balance charged against him on said account, except interest on the items incurred in behalf of said land and cattle business, which interest was to be paid by Fuqua personally. That the proceeds of said note passed to the credit of the account of Rush for the full amount of the face value thereof, and that Rush had the benefit thereof on the account, and that all of these facts were well known and understood by defendant Rush. That, after the execution of the note, Rush continued to draw checks and to incur the items of indebtedness which were charged upon said account, and that the checks and indebtedness so charged not only absorbed the note, but left a large overdraft charged against defendant Rush. That numerous deposits were made by Fuqua to the credit of the impersonal accounts above referred to, subject to the right of plaintiff to appropriate same to the discharge of the indebtedness standing on the books of the bank against Rush. That the bank did not know what part of the funds held in said impersonal accounts belonged to the defendants, or either of them, but was willing and ready to account for whatever might be ascertained to be Rush's share of said funds after the indebtedness due to the plaintiff from Rush and the partnership was satisfied.

Plaintiff further alleged that about the 16th day of November, 1907, it transferred the amount standing on its books in said impersonal accounts, amounting to about $22,000, to the credit of said account standing on its books in the name of Rush, intending thereby to appropriate said deposits which had been made in the impersonal accounts to the payment of the items charged to said J. W. Rush's account, except interest for which it looked to Fuqua alone, and to hold the remainder of said transfer, if any, subject to settlement and distribution between Rush and Fuqua, and that the transfer should be subject to the rights and equities of all the parties to the litigation. Attached to this answer was a statement of the several accounts referred to. The bank asked that Fuqua be made a party to the suit, and that an accounting be had between Fuqua and Rush and between them and the bank, and that an auditor be appointed, and that the rights of the parties as to all the transactions might be fully determined. The bank further alleged that the amount of the funds which would be due to Rush would not be sufficient to liquidate or discharge the overdrafts, and that no part of the funds deposited in said impersonal accounts could be applied to the discharge of the note sued on. The court appointed an auditor who made a report, and upon trial by jury the court gave the jury a peremptory charge, to find the following verdict:

"We, the jury, find that the intervener, W. H. Fuqua, and the defendant, J. W. Rush, were partners in the cattle business and the land business in controversy; that the amount of funds advanced by intervener through plaintiff for the cattle business was $10,458.17; that the receipts from cattle sales were $15,305.70, to which should be added interest on the cattle notes collected by intervener through said bank amounting to $994.60, making in all $16,300.-30; that the net profits of the cattle business were $5,842.13, to be divided equally, $2,921.06 to intervener and defendant each; that the amount of funds advanced by intervener through plaintiff bank for the land business was $9,720.00; that the receipts from the land sales were $32,750.00, to which should be added interest collected on the land notes by intervener through plaintiff bank $947.81, making in all $33,697.81; that the profits of the land sales were $23,997.81 to be divided one-third to the defendant, $7,972,60, and two-thirds to the intervener, $15,985.20; that defendant's total profits land and cattle are $10,913.66; that defendant Rush has in his hands cattle proceeds amounting to $2,881.25, besides the Gid Jowell notes of the face value of $20,000.00, making a total of $22,881.25; that after deducting his total profits of $10,913.66 from said amount there remains for which he should account to the intervener $11,967.59; that the amount of the defendant's personal overdraft on the plaintiff with six per cent. interest on each item from its date after deducting the deposit of $2,500, on November 8th, 1906, with 6 per cent. from its date is $10,890.36."

From the judgment rendered on said verdict the defendant Rush appealed, and the Court of Civil Appeals of the Seventh District reversed and remanded the cause for a new trial. A full statement of the case and the reasons of said reversal will be found

in the two opinions of the Court of Civil Appeals (160 S. W. 319, 609).

Such other facts as we deem essential to be considered in connection with the propositions considered by us will be stated in the opinion.

### Opinion.

As will be seen from the statement, the trial court gave the jury a peremptory charge to find that Rush and Fuqua were partners in the land transaction and that Fuqua was entitled to two-thirds of the profits of said venture.

[1] In determining whether this action of the court was authorized by the evidence, it will only be necessary to state the testimony relied upon by the defendant Rush. If the testimony offered by him was sufficient to authorize a finding that the contract was purely executory and had never been executed, or that the parties by mutual consent or agreement had abandoned or rescinded it, then the giving of the peremptory charge was improper, even though all this evidence was controverted by testimony offered by Fuqua and the bank.

We do not think it necessary to go into the cattle transaction further than to say that the evidence shows that such a partnership existed, and that the bank had at Fuqua's direction paid numerous checks drawn on it by Rush, and that all of said sums so paid were charged on the books of the bank to Rush and there carried as an overdraft until, as alleged by the bank, the items in the impersonal accounts in the name of "Fuqua-Rush Cattle Account" were transferred on the books and credited to the account of Rush. Rush testified that he did not know how the accounts were carried on the books of the bank, and that he did not know until long after the purchase of the land that the moneys to be advanced by Fuqua in the cattle transaction had not been in fact advanced by him. He further testified that, while he had drawn on the bank for money for his personal use, this was done under an agreement with Fuqua that he might do so, and that he should account for the funds so drawn.

With reference to the land transaction, Rush testified that, before making any contract for the purchase of the land, he saw Fuqua, and that Fuqua then told him to go ahead and buy the land, and that he would have his check for the first payment paid by the bank, and that he (Fuqua) would either go in with him in the purchase of the land and furnish all the necessary money without interest and take two-thirds of the profits after repaying the purchase money, or would loan Rush the money to pay for the land; that under this agreement he contracted for the land at the price of $9,600 and gave a check on the bank for $960, which was paid by the bank; that a short time after contracting for the land he saw Fuqua; and that Fuqua then directed him to have the deed made to himself (Rush) and to instruct the seller to send the deed, reciting a full cash consideration to the bank, and he would pay for the land. At the time of this last conversation, the written agreement set out in the statement was prepared and signed. According to Rush's testimony, on the same day and about two or three hours after the execution of the written agreement, and before any payment for the land had been made except the $960, he saw Fuqua again, and that Fuqua then told him that he had decided that it would be best for Rush to make a note to the bank for the money and to make it for $12,000, as Rush would need a little more money or owed a little more, or words to that effect, and directed Rush to secure the note to the bank by making a deed of trust on the land purchased and a section adjoining it.

Rush testified that he then told Fuqua that the adjoining section belonged to his wife, and that Fuqua then said, "You sign up a note and deed of trust and she will have to sign it with you or it won't be any account"; that he acquiesced in the demand of Fuqua; and that Fuqua then had the note for $12,000 payable to the bank prepared and also the deed of trust, and both were executed by Rush and his wife, and the deed of trust, after being recorded, was with the note delivered to the bank. Rush testified that the foregoing was all that occurred at that time. The $12,000 proceeds of the note was credited on the account of J. W. Rush, and, when the deed was received by the bank, the balance of the purchase money was paid by the bank and charged to the account of Rush.

The books of the bank show that on April 6, 1906, the date of the execution of the note, Rush had drawn on the bank checks for about $2,500 for his personal account, which were not properly chargeable to the cattle partnership, and that these checks had been paid and charged to the J. W. Rush account. Omitting the personal checks drawn by Rush for his personal account, and giving credit for the funds deposited in the Fuqua-Rush cattle account, the J. W. Rush partnership account was overdrawn on April 6, 1906, only about $1,265; and, treating the Rush partnership and individual account as one, the total of the overdraft on the day the note was executed was approximately $3,900. Rush testified that as he sold the land he delivered all money and notes received from such sales to Fuqua and instructed him to credit the same on the note, and that he also delivered to the bank $2,500 of his individual funds and directed that it be credited on the note. The proceeds of the sale of the land and the $2,500 of his individual funds paid to the bank by Rush was more

than sufficient to pay the note. None of these payments were in fact credited by the bank on the note, but were instead deposited to the credit of Fuqua-Rush land account, and subsequently in 1907 were transferred and credited to the J. W. Rush account. Rush further testified that, when he instructed Fuqua to credit the payments on the note, Fuqua made no objection.

The note remained in the bank without credit until the suit was filed, and no demand was ever made for payment until a short time before the suit was filed in the year 1910.

The $20,000 Gid Jowell notes were given for 200 acres of land which was the last sold of the section referred to in the written contract.

Rush testified that, when he sold the 200 acres, he requested a release of the deed of trust, and that Fuqua agreed to send it to Tulia where the land was situated, but that the release was sent with instructions not to deliver it unless the purchase-money notes received by Rush were delivered to the bank, that he protested against this, but finally indorsed the notes in order. to effect the sale.

We have omitted the testimony as to transactions after the controversy arose.

Whether the contract, if fully executed, would have made Rush and Fuqua partners as to the land itself, is not material to be decided. Whether there was to be a community interest in this land, or Rush was to hold the legal title merely as trustee for Fuqua and was to receive a portion of the profits, as seems to have been decided in construing a similar contract in Mansfield v. Wardlow, 91 S. W. 859, is, we think, immaterial. The contract does evidence an agreement to engage in a joint adventure for profit, and if executed would have entitled the parties to share in the profits as provided therein.

Fuqua and the bank insist that the written agreement evidences an executed contract at least on the part of Fuqua, and that therefore from the time of its execution it was in fact an existing partnership. Fuqua and the bank further insist that parol evidence was not admissible for the purpose of showing that the contract was in fact not an executed one. On the other hand, Rush insists that the contract, when read in the light of the conditions existing at the time of its execution, was a mere executory agreement to enter into a partnership, and that the evidence shows that the same was never in fact carried out, but was by the parties abandoned.

The proper construction of this contract is, we think, important. Fuqua and the bank insist that the contract was unambiguous and that there is no room for construction.

[2] Looking at the contract alone, and assuming the recitals thereof to be true, the contract is unambiguous, and there is no room for construction. When, however, the contract is read in the light of the situation of the parties and the circumstances as they then existed, it is apparent that, while the contract speaks of certain things as having been done, it must be interpreted as an agreement to do the things. It recites that Rush has purchased the land and that Fuqua has paid the purchase money. In fact, both parties pleaded, and the evidence showed, that Rush had not in fact purchased the land and that Fuqua had not paid the money. Rush had contracted for the land and Fuqua had in fact paid nothing, unless the payment by the bank of Rush's check for $960 be construed as a payment by Fuqua. Notwithstanding the contract read literally shows an executed agreement, yet we think that properly construed in the light of the evidence it was purely executory. In other words, it was an agreement to be executed by the parties in the future. The rule excluding parol evidence to aid in the construction of the contract does not apply to this case, although the contract standing alone is not ambiguous. The ambiguity or uncertainty as to the meaning of the words used clearly appears in the contract as applied to the subject-matter and the situation of the parties.

Quoting from the case of Klueter v. Joseph Schlitz Brewing Co., 143 Wis. 347, 128 N. W. 43, 32 L. R. A. (N. S.) 383:

"It seems to be thought that, unless ambiguity can be discovered in the language of the paper, looking at that only, it must, regardless of circumstances, be taken in its literal sense as expressing what the parties agreed to. There is no such rule, though it may be there is room for one to be misled in respect to the matter as he reads the numerous discussions found in the books on the subject, unless he carefully notes differences in situations treated.

"The very familiar rule is often stated and applied, that oral testimony is not admissible to contradict or vary a written contract. It is perfectly consistent with that other rule, likewise often stated and applied, that oral testimony is admissible for the purpose of applying the contract to the subject with which it deals, and, in case of ambiguity then appearing, to establish the facts and circumstances under which the agreement was made, in order that the language thereof may be read in the light of the environment at the time the parties chose such language to express their intention.

"It is said that when the language of a contract is plain, it is not open to construction. That is true in a general sense, but, unless viewed broadly, it does not convey accurately the full scope of the field where rules for construction are applicable. The words of a contract, in themselves, may be plain, yet, when applied to the situation with which it deals, not plain, the literal sense leading to such unreasonableness as to suggest that the parties probably did not so intend. In so applying the contract, oral testimony is generally necessary and permissible to the end that the full scope of the situation dealt with may be observed. As to when the language of a contract, in its literal sense, is to be taken as expressing the intention

of the parties, is correctly indicated by Vattol's rule which has been often cited by this and other courts: 'When the meaning is evident, and leads to no absurd conclusions, there can be no reason for refusing to admit the meaning which the words naturally present.' Note the language, 'when the meaning is evident.' The meaning is not evident when, if looking at the subject-matter, it is so unreasonable as to appear unlikely that the parties so intended. To enable one to read the contract in the light of the subject-matter and the effects and consequences, obviously evidence of facts and circumstances, not mere conversations, leading up to and concurrent with the making of the contract, is often necessary. One of the elementary rules found in 1 Greenl. Ev. (15th Ed.) § 286, and often cited by this and other courts, covers this subject. It is phrased thus:

" 'As it is a leading rule, in regard to written instruments, that they are to be interpreted according to their subject-matter, it is obvious that parol or verbal testimony must be resorted to, in order to ascertain the nature and qualities of the subject to which the instrument refers. Evidence which is calculated to explain the subject of an instrument is essentially different in its character from evidence of verbal communications respecting it. Whatever, therefore, indicates the nature of the subject, is a just medium of interpretation of the language and meaning of the parties in relation to it, and is also a just foundation for giving the instrument an interpretation when considered relatively, different from that which it would receive if considered in the abstract.' "

These principles have been announced in cases in this state. Watrous' Heirs v. McKie, 54 Tex. 69; Haldeman v. Chambers, 19 Tex. 46; Kingsbury v. Carothers (Civ. App.) 27 S. W. 15 (writ of error refused). Also by many other authorities. Kauffman v. Raeder, 108 Fed. 171, 47 C. C. A. 278, 54 L. R. A. 247; 6 R. C. L. 836 and 837, and cases cited.

Read in the light of the situation of the parties and the circumstances surrounding the transaction, in order to give this contract any reasonable interpretation we are bound to conclude that the true effect and meaning of the contract was that Rush was to procure a conveyance of the land to himself, and that Fuqua was to repay to the bank the $960 which had been drawn by Rush and applied as a first payment on the land, and that Fuqua was to pay the balance due for the purchase of the land. As will be seen from our interpretation of this contract, the contract on Fuqua's part was purely executory. If it is true, as testified by Rush, that Fuqua had agreed that he would either furnish the money and take a part of the profits from the sale of the land, or would have the bank loan Rush the money, then prior to the time the contract was signed, Fuqua was under no obligation to Rush to pay the $960 which had been advanced by the bank. After the execution of the contract, Rush had nothing more than Fuqua's promise to pay the $960 to the bank and to advance the other money necessary to pay for the land.

[3] After the execution of the contract, if, as testified by Rush, Fuqua demanded the execution by Rush and his wife of a note and deed of trust to the bank for the purpose of securing the moneys which Fuqua had agreed to advance and pay, and, if Rush, as testified by him, acquiesced in this demand and executed the note for $12,000 to the bank, bearing 10 per cent. interest, we think that these facts standing alone would be sufficient to authorize a finding that the written contract had been abandoned by mutual consent. Standing alone, and viewed in the light of the previous conversations between Rush and Fuqua, a reasonable interpretation of the transaction is that after the execution of the written contract Fuqua determined that instead of advancing the money he would, as had been previously suggested, have the bank to loan Rush the money upon security, and that Rush should pay interest to the bank and not divide the profits with Fuqua. There are other circumstances which tend to show that Fuqua did not consider himself bound to pay the bank the money advanced to pay for the land. The fact that interest was by his order regularly charged upon all amounts drawn by Rush—we say by his order because it is shown that the books were kept under his direction—the fact that he caused the suit to be instituted against Rush alone for the amount due the bank, while if the partnership existed, as claimed, a large part of this indebtedness was in fact his own debt to the bank, and the writing by him of a letter to Rush demanding payment of the note— are such circumstances. Our conclusion is that, while the evidence is not conclusive that the executory agreement had been abandoned, the evidence clearly raised the issue, and that therefore the trial court erred in giving the jury a peremptory charge to find that Rush and Fuqua were partners in the land transaction.

[4] We are also of opinion that if the contract is construed, as we have done, as an executory agreement for a joint adventure which is but a species of partnership, that if Fuqua after agreeing to furnish the necessary money failed to do so, that Rush had the right to treat the contract as abandoned by Fuqua, and thereafter Fuqua would not be entitled to recover any part of the profits. See Rowley on Partnership, vol. 2, § 981, and cases cited.

[5] In view of the fact that this case must be reversed, we will say that in our opinion the testimony of Fuqua to the effect that Rush at all times knew and was fully informed of the manner in which the account had been carried on the books of the bank, and the further testimony of Fuqua to the effect that the execution of the note and deed of trust by Rush and wife to the bank were not intended by him as an abandonment of the original agreement, but that it was fully understood with Rush that the money to be

advanced by Fuqua under the terms of the contract would be furnished by the bank upon Rush's account, and that Fuqua as between Rush and Fuqua should assume the liability to the bank, raises an issue of fact; the issue being whether the executory written agreement had been by the parties abandoned. We have not undertaken to set out all the evidence on this issue, but only enough to show that whether the contract had been abandoned was a controverted issue. We fully agree with the contention of the bank and Fuqua that, where a partnership exists, the mere failure of one of the parties to pay money into the partnership under the partnership agreement will not work a forfeiture of his interest and a dissolution of the partnership. A partnership agreement, however, like any other contract, may be rescinded or abandoned by the parties, and the fact of abandonment or rescission need not be shown by proof of an express agreement, but may be implied from acts and conduct of the parties inconsistent with an intention on their part to continue the contract, and this is especially true of a contract executory in its nature and where little or nothing has been done towards its performance. 6 R. C. L. tit. Contracts, § 307, and cases cited.

The Court of Civil Appeals held that the verdict which we have set out in the statement of the case and the judgment rendered thereon did not appear to be based on the cause of action sued on; that is, on the note. We do not think it necessary to determine this question; but, as we construe the bank's pleading, its suit was against Rush to recover on the note, and not for any balance due upon open account. The defendant Rush admitted the execution of the note and relied entirely upon his plea of payment. Under these circumstances, the issues made by the pleading as between the bank and Rush should have been tried, and it is not clear to us that the judgment rendered was based on these issues. It seems to be predicated on other issues involving a settlement of the partnership affairs as between Fuqua and Rush.

It may well be doubted whether Fuqua ought to have been permitted to intervene in this suit in order to obtain an adjudication and settlement of the partnership affairs. The confused condition of this record is a strong argument against permitting such intervention. The error, if any, in permitting Fuqua to intervene, however, was not assigned in the Court of Civil Appeals; and taking into consideration the fact that the right of intervention is to some extent discretionary with the trial court, and also considering the great lapse of time since this suit was filed, we think that the plea of intervention should not at this late day be dismissed. The right of the bank in its suit on the note should not, however, be confused with the partnership settlement between Fuqua and Rush. Under the pleading, the bank was entitled to recover against Rush the amount of the note sued on less such payments as had been made, which ought to have been credited thereon.

If it should be found upon another trial that Fuqua and Rush were not partners as to the land transaction, and that Rush had instructed Fuqua or any other authorized officer of the bank to credit the moneys and securities derived from the sale of the land on the note sued on, then such credit should be entered as of the dates of the respective payments.

If, on the other hand, it should be determined that Fuqua and Rush were partners in the land transaction and that there were no instructions to the bank to credit the payments on any particular debt, then the payments made by the firm of Fuqua and Rush, out of the proceeds of the sale of the land should be credited on the indebtedness incurred in the land transaction whether evidenced by note or open account. Fuqua, in that event, as between him and Rush should be charged with all principal and interest on moneys expended in the land transaction. Rush should, of course, be charged as between the partners with all partnership money appropriated by him. If any recovery is had by the bank on the note sued on, it will be, we think, entitled to a lien on the Gid Jowell notes or the proceeds thereof to secure its payment.

[6] We think that the contention of Rush that Fuqua's method of handling the transaction through the bank was such a breach of his duty to the bank as would prevent any recovery by him is not sustained by the testimony.

As we read the record, Rush's testimony as to the land transaction shows a loan by the bank to him of the $12,000 upon ample security. Fuqua's testimony is that the bank really loaned the funds to Fuqua and Rush, transacting business in the name of J. W. Rush, and that as to the bank both partners were liable, but as between the partners he was to pay the debt. He further testified that all the other officers of the bank were familiar with the entire transaction and knew that while his name did not appear that he was in fact a partner and was liable to the bank. We have been cited to no law which prohibits this transaction in either form.

[7] Other questions involved in this case will probably not arise on another trial. We will, however, say that in the settlement of the partnership affairs uncollected notes and accounts should not be treated as money and charged to either party. The court under its equity powers can provide for the collection or sale of the notes and the proper distribution of the proceeds.

Our conclusion is, and we advise, that the

judgment of the Court of Civil Appeals reversing and remanding this case for a new trial should be affirmed, and that the case be remanded to the trial court for further proceedings not inconsistent with this opinion.

PHILLIPS, C. J. The judgment recommended by the Commission of Appeals is adopted and will be entered as the judgment of the Supreme Court. We approve the holding on the question discussed.