**DIBRELL v. RAMSEY BROS.  (No. 7105.)***

Court of Civil Appeals of Texas.  Austin.
April 20, 1927.

Rehearing Denied May 11, 1927.

I. Sales ⟜181(11)—Evidence sustained findings that buyer was ready to perform and seller was unwilling to perform contract for sale of ewes and sublease of ranch on date for performance.

Evidence *held* to sustain findings that buyer was ready, able, and willing to perform, and that seller was not ready, able, and willing to perform, contract for sale of ewes and for sublease of ranch on date for performance.

2. Trial ⟜140(1), 143—Where testimony is conflicting, credibility of witnesses and weight of testimony is for jury.

Where testimony of witnesses was diametrically opposed one to the other, and there were apparent contradictions and inconsistencies in their testimony, credibility of witnesses and weight to be given to their testimony was for jury.

3. Contracts ⟜256, 316(5)—Where each party claimed breach by the other by previous acts, but each insisted on performance, contract was subsisting and breaches were waived.

Where each party claimed a breach of contract by the other by acts done before date for performance of contract, but neither acquiesced therein as termination of contract but insisted on performance by the other party, contract was subsisting on date for performance, and any breach thereof by either party was waived.

Appeal from District Court, Tom Green County; J. F. Sutton, Judge.

Suit by Ramsey Bros. against Will C. Dibrell, in which defendant files counterclaim. From the judgment, defendant appeals. Affirmed.

C. T. Dalton, of San Angelo, and Dibrell & Snodgrass, of Coleman, for appellant.

Jas. Cornell and Collins & Jackson, all of San Angelo, for appellees.

McCLENDON, C. J. Suit by Ramsey Bros. against Dibrell for breach of contract under which Dibrell agreed to sell and deliver on August 1, 1924, to Ramsey Bros. 665 ewes at $6.25 per head, and to sublease to Ramsey Bros. the Sheppard ranch of 5,771 acres, from August 1, 1924, to April 30, 1929, at 57 cents an acre per annum. Ramsey Bros. sued for $500 deposited with Dibrell as forfeit on the contract, and for damages for failure to deliver the ewes and possession of the ranch. Dibrell counterclaimed for breach of contract by Ramsey Bros. Only the items of the forfeit deposit and damages for failure to deliver the ewes is involved in the appeal.

The case was tried to a jury on three special issues, which, with the jury's answers thereto, follow:

"(1) Do you find from a preponderance of the evidence that on August 1, 1924, Ramsey Bros. were ready, able, and willing to perform their part of the purchase and sale agreement of July 14, 1924? Answer: Yes.

"(2) What was the reasonable market value per head on August 1, 1924, in Tom Green county, of the sheep involved in the contract between plaintiffs and defendant, of date July 14, 1924? Answer: $6.75 per head.

"(3) Do you find from a preponderance of the evidence that on August 1, 1924, the defendant, Will C. Dibrell, was ready, able, and willing to carry out his part of the purchase and sale agreement of July 14, 1924? Answer: No."

Upon these findings the judgment was for Ramsey Bros. for $832.50 ($500 forfeit money and 50 cents a head on the ewes), with legal interest thereon from August 1, 1924, and costs of suit. Dibrell has appealed, assigning as error that findings 1 and 3 are without support in and against the great weight and preponderance of the evidence.

Dibrell made no objection to the issues submitted, and it will be observed that they narrow the controversy in the case to the readiness, ability, and willingness of the parties on August 1, 1924, to perform their respective parts of "the purchase and sale agreement." The evidence upon this issue rests entirely in the testimony of Dibrell on the one hand and Hal Ramsey, a member of the firm who conducted the negotiations for Ramsey Bros., on the other. The testimony of these witnesses on this point is diametrically opposed the one to the other. Dibrell contends, however, that, taking all the testimony in the case and the attendant circumstances, it cannot be fairly deduced therefrom that he was not ready, able, and willing to perform the contract on August 1, and that the testimony of Ramsey is so inconsistent and contradictory and at variance with the reasonable deductions therefrom and from the surrounding circumstances that it cannot be accepted as supporting his claim that he was ready, able, and willing to perform. This contention is presented both as a question of law and as one of fact within the jurisdiction of the Court of Civil Appeals to set aside a judgment manifestly against the overwhelming weight of the evidence.

[1, 2] There are a number of apparent contradictions and inconsistencies in the testimony of Ramsey, but the same criticism can be passed with equal justice upon the testimony of Dibrell, and, after a careful perusal of the entire statement of facts, we have reached the conclusion that the evidence sustains the verdict, and is not of such a character as to warrant setting it aside upon either ground contended for. Both Dibrell and Ramsey were interested parties. The jury heard them testify, and we believe the case comes clearly within the rule giving the jury exclusive power to pass upon the credibility

of the witnesses and the weight to be given to their testimony.

The following, we think, is a fair statement of the case presented under the assigned error:

The Sheppard-Dibrell lease, which was executed in 1921, and which expired June 1, 1929, and called for an annual rental of 31 cents an acre, contained no provision for sale of any portion of the ranch during the lease period. It had certain provisions with reference to use of the property, making repairs and improvements by Dibrell, and contained an express covenant against subletting without written consent of the lessor. At the time of the contract in suit Sheppard, the lessor, had died, and his surviving wife was his independent executrix. The Dibrell-Ramsey contract was in writing and was executed July 14, 1924. It in effect made Ramsey Bros. subtenants under Dibrell, giving them all the rights and privileges and charging them with all of the obligations of Dibrell under the Sheppard-Dibrell lease. Its language carefully guarded against any expression that would make it a sublease, the privileges granted to Ramsey Bros. were designated as "pasturage" and "grazing," and it shows an evident purpose of avoiding conflict with the covenant against subletting in the Sheppard-Dibrell lease. While this purpose was not accomplished in law, it is shown that the parties discussed the matter, and had endeavored to do so, each acting apparently in good faith. Shortly after executing this contract Dibrell had information that it probably violated the Sheppard-Dibrell lease, and he went to Coleman about July 21st and conferred with his attorney there, with the result that a new draft of contract was prepared, designed to obviate this conflict. This draft was not introduced in evidence, and we are not advised as to its terms. Just after this there there was a conversation between Dibrell and Ramsey with reference to execution of this new draft. Dibrell fixed the date of this conversation as July 22d and after a lease from Mrs. Sheppard directly to Ramsey, which will be referred to later. According to Dibrell, he wanted Ramsey to sign the new draft, but Ramsey refused, saying, "The Sheppards are in town to lease me this ranch to-day, and I won't sign it." When he got home that afternoon (quoting from his testimony), "the telephone rang and Mr. Ramsey stated over the phone that he had leased the ranch from the Sheppards. I said, 'All right; don't you put your foot on the premises and don't put any stock there.'" According to Ramsey, the conversation alluded to took place July 21st and prior to the signing of the Sheppard-Ramsey lease. His version of the conversation is that Dibrell told him Mrs. Sheppard was "raising Cain," and that if Ramsey did not sign both would lose the ranch. He denied that he told Dibrell

he was arranging to make a lease with Mrs. Sheppard. He testified that he declined to sign the new draft, but told Dibrell that he would live up to the original contract. On cross-examination he testified:

"Q. Isn't it a fact when he (Dibrell) came back from Coleman and saw you about the 21st of July you told him the trade with him was off, that you were going to lease this ranch from Mrs. Sheppard and that they were preparing lease for it, and Mr. Dibrell said, 'All right,' and didn't he say, 'Don't put your foot on that ranch and do not put any live stock there'? A. Yes, sir."

Counsel for Ramsey Bros. contend that the witness meant to answer "yes" only to the last part of the question quoted to the effect that Dibrell told him not to put his foot on the ranch. This construction is a reasonable and proper one, if it were necessary in support of the judgment, because if the answer be applied to the other portions of the question a direct conflict is thereby produced with other portions of this witness' evidence, in which he testifies in very positive terms.

On July 22d Mrs. Sheppard executed and delivered to Ramsey Bros. a lease covering 3,951 acres of the Sheppard ranch for a period of three years from August 1, 1924, at an annual rental of 50 cents an acre. This lease was absolute in terms. Ramsey testified with reference to it, however, that it was conditional upon Mrs. Sheppard's getting back the ranch, and that he entered into it to protect himself, as he did not want to lose his money both ways. This lease was filed for record, but whether before or after August 1st is not shown, and Ramsey denied that he had anything to do with its filing. On July 31st Mrs. Sheppard executed an instrument whereby she granted to Dibrell the privilege of subletting the ranch. This instrument contained a provision terminating the lease on three of the ranch sections upon sale after August 1, 1927—a provision which the Sheppard-Dibrell lease did not contain. With reference to this instrument Dibrell testified that shortly before August 1st his wife telephoned him that Mrs. Sheppard wanted to see him, and "I came down, and she wanted to give her consent to this lease. Shortly after that this instrument was prepared in which Mrs. Sheppard gave her consent."

On cross-examination he testified:

"After we had executed the instrument she asked me as a favor if I would not give her permission to sell part of the land."

Ramsey testified that he did not know that Dibrell himself got the consent of Mrs. Sheppard to a subletting. In another place he testified:

"After I got Mrs. Sheppard's consent to this transaction, I offered after that to carry out the contract. * * * After I got Mrs. Sheppard's consent to the contract I would have

paid him $6.25 a head for the sheep, * * * and I was ready, able, and willing to do so. I told him I was ready about the 1st of August, and he said for me not to put my foot on the ranch."

And, further:

"I did not pay Mrs. Sheppard anything to agree to it. Will Dibrell did not send a check through me to get her to agree to it. I did not promise her that he would pay her anything to agree to it. I just told her I wanted to sublease it and wanted her permission, and she agreed to give her permission free on my requesting it; she said she would do it. I don't know whether Mr. Dibrell gave her anything or not; I didn't. When I was there I got her permission free. She said 'Hal, I would as soon you would have it as anybody.'"

With reference to what took place on August 1st, Dibrell testified that Ramsey declined to carry out the contract, stating:

" 'I have bought them too high, and my brother has gone out of the deal, but if you will take my Studebaker car I will trade; otherwise I won't; and if you don't give me my forfeit back I will sue you.' And I told him to crack his whip. He did not render me any money that day, and did not offer to carry out the deal unless I would take this Studebaker car on the deal. I told him at that time I had Mrs. Sheppard's consent, that I had her written consent and was ready to turn the thing over to him."

Ramsey's testimony was that he did not know Dibrell himself got the consent of Mrs. Sheppard to a subletting; that, while he did not offer Dibrell any money on August 1st, because Dibrell did not have anything for him to offer anything for, and "he had this lease but he would not carry it out," he (Ramsey) had made arrangements for the money, and it was there for Dibrell, and he "offered to pay it all when he turned it over to me." He denied specifically the statement of Dibrell that he attached to his offer of performance the condition that Dibrell would take his Studebaker in the deal, and testified that the proposition with reference to the Studebaker was made at the time the original negotiations took place between him and Dibrell.

[3] While a number of questions relative to the respective rights of the parties prior to obtaining Mrs. Sheppard's consent to the subletting suggest themselves, they become unimportant in the light of what took place during the negotiations for and after obtaining such consent. We may assume that the contract was unenforceable unless Dibrell secured Mrs. Sheppard's consent, and if he failed to do so appellees would not be further bound and could recover what they had paid. We may also assume that appellees were obligated to give Dibrell a free hand in obtaining that consent, and that their taking a lease direct from Mrs. Sheppard at a lower rental than they were to pay Dibrell, and a higher rental than he was to pay Mrs. Sheppard, although conditional, amounted to a breach of contract by appellants, or that the Sheppard-Ramsey lease inured to the benefit of Dibrell and relieved him of the necessity of obtaining Mrs. Sheppard's consent. The subsequent negotiations of the parties show, however, that, while each was claiming a breach by the other, neither acquiesced therein as a termination of the contract, but insisted on performance by the other party. Under these circumstances we must treat the contract as still subsisting on August 1st and any prior breach thereof by either party as waived. Bank v. Rush (Tex. Com. App.) 210 S. W. 521.

The first and third issues submitted only the readiness, ability, and willingness of the respective parties on August 1st, "to perform their part of the purchase and sale agreement." These issues eliminate any question regarding Mrs. Sheppard's consent, and we think properly so, as the evidence of each party clearly indicates that that matter was not taken into consideration on August 1st, but was regarded by each as settled; Ramsey's testimony being that he had obtained Mrs. Sheppard's consent and offered to consummate the contract, but Dibrell refused, and Dibrell testifying that he offered compliance but Ramsey refused. If Ramsey's refusal had been predicated on the sales privilege in the Sheppard sublease agreement, the question might have arisen whether Dibrell breached the contract in that regard under the inference to be drawn from his testimony that Mrs. Sheppard was willing to give her consent unconditionally, but as a favor to her he "gave her permission to sell part of the land."

The findings complained of are, we think, fully supported by the evidence, and the trial court's judgment is affirmed.