## THOMPSON v. REED et al.
### No. 1127.

Court of Civil Appeals of Texas. Eastland.
June 9, 1933.

558

Chandler & Keith and R. L. Thompson, all of Stephenville, for appellant.

C. E. Florence and Edwin M. Fulton, both of Gilmer, for appellees.

LESLIE, Justice.

The plaintiff, R. L. Thompson, an attorney, sued the defendants, Ernest W. Reed and M. Frankness Reed, in Erath county, Tex., to recover on an employment contract. M. F. Reed resided in that county, and E. W. Reed filed plea of privilege to be sued in Upshur county. The plea was controverted, and at the conclusion of a trial before the court the plea of privilege was sustained. The plaintiff appeals, and the parties will be referred to as in the trial court. There is a statement of facts, but no findings of fact or conclusions of law.

The plaintiff's contention is that the two Reeds were partners or joint adventurers in an undertaking, and that they employed him to file and prosecute a lawsuit in the district court of Upshur county, Tex., in which E. W. Reed, A. R. Loden and wife were plaintiffs, and the Danciger Oil & Refining Company and others defendants; that, under the terms of the contract of employment the Reeds jointly and severally obligated themselves to pay to the plaintiff a portion of the recovery, amounting to approximately $2,275. There was an alternative plea for a reasonable value of the services alleged to be $3,000.

The correctness of the court's judgment is challenged by various propositions briefed in the main under a single statement from the record. The controlling ones present the contention that the undisputed facts establish the venue of the cause in Erath county. It is immaterial to the decision of this case whether the enterprise on the part of the Reeds, and out of which the alleged liability is charged to have arisen, grows out of a partnership relation or joint adventure. The legal effect of either would be the same in so far as the determination of the venue question is concerned.

In Spencer v. Jones, 92 Tex. 516, 50 S. W. 118, 71 Am. St. Rep. 870, it was held by our Supreme Court that a partnership may be formed for the purpose of a single purchase of land, with a view to selling it for profit. Many other authorities are to the same effect. Allison v. Campbell, 117 Tex. 277, 298 S. W. 523, 1 S.W.(2d) 866; Peck v. Powell (Tex. Civ. App.) 259 S. W. 640, reversed on other grounds, Morris v. Peck (Tex. Com. App.) 271 S. W. 891; Rush v. Amarillo First Nat. Bank (Tex. Civ. App.) 160 S. W. 319, reversed on other grounds (Com. App.) 210 S. W. 521; Tanner v. Drake (Tex. Civ. App.) 47 S.W.(2d) 452.

■ That such a relation may arise out of the acts and agreements of parties in acquiring and selling mineral leases and rights thereunder cannot be doubted. In such cases it is simply a question of fact whether such relations have been created. The testimony brings the legal status of the Reeds well within the rule of partnership relations.

Under the authorities and the testimony the case as to the Reeds may also be regarded as reflecting a joint venture on their part, with the usual legal consequences attending. Thompson v. Duncan (Tex. Com. App.) 44 S.W.(2d) 904, 907; Smith v. Kendrick (Tex. Civ. App.) 55 S.W.(2d) 598; Burton-Lingo Co. v. Federal Glass & Paint Co. (Tex. Civ. App.) 54 S.W.(2d) 170.

■ In the Thompson Case the court, in discussing the elements of a joint venture, said:

"One of the characteristics which distinguish a joint adventure from a partnership is that the latter is formed for the transaction of a general business of a particular kind, while a joint adventure is usually limited to a single transaction. [Authorities.]

"Courts do not treat a joint venture as identical with a partnership, yet it is universally held that such relation is so similar in its nature to a partnership and in the contractual relation created thereby that the rights as to the members are governed by substantially the same rules that govern partnerships. [Authorities.]"

We are not interested so much in the extent to which the elements of a joint adventure may be found in a partnership, but the controlling point in the instant case is that the facts establish a joint and several liability of the defendants to Thompson for the services rendered, and it is immaterial that the liability springs from a partnership relation or one of joint adventure.

To a reasonable extent we deem it proper to point out the testimony, some in substance and some according to its tenor, upon which this conclusion is based.

When oil was discovered in the vicinity of Upshur county, the defendant M. F. Reed was residing in Erath county, Tex., where, at the date of this trial, he had resided continuously since 1918. He was an individual,

with ability, otherwise than financial, to venture into such a locality under such conditions and locate and acquire likely oil and mineral leases. Developments in that field at that time lent the usual attractions for such persons. At first his activities were directed and supported by two individuals in Stephenville, but it seems that, when said Reed began negotiating for, or was about to consummate a deal for the lands incidentally involved in this suit, these first two individuals refused to advance further expense funds, indicating that their interest was solely in buying leases and royalties, and not in purchasing lawsuits. These lands, owned by A. R. Loden and wife, were situated on the line of Upshur and Gregg counties, and Reed's investigations disclosed that, although the lands purported to be under lease, the owners thereof had acknowledged the instrument before a notary public in a county other than the notary's residence. A royalty conveyance covering the land was also of questionable legality. These conveyances were evidently executed in the early or wildcat stage of oil development in that territory.

Negotiations between M. F. Reed and the Lodens terminated in a definite understanding between them, whereby they agreed to assign a 40 per cent. mineral interest in said lands, provided the person receiving the same would clear the title of said land by affecting a cancellation of said lease and royalty contract, this to be done free of cost to the Lodens. This M. F. Reed was unable to accomplish without aid from outside sources, and, the two original parties being unwilling to interest themselves in matters of litigation, which were essential to the acquisition of the 40 per cent. interest in said lands, said Reed thereafter cast about for some one who was willing to undertake the enterprise. His interest in the property and his understanding with the Lodens at this time is aptly described in his testimony. Concerning his interest as thus acquired, he was asked on the trial: "Q. You figured it was yours and if Reed (E. W.) hadn't made that trade with you, you would have made it with someone else? A. Yes, I had it where I could get it and was trying to find somebody that had enough money to back the thing up and finance it."

At this point he interested his codefendant, E. W. Reed, in the acquisition of the mineral interest in the Loden lands. The undisputed facts show that they effected an agreement whereby they undertook to clear the lands of the clouds cast on the Lodens' title by reason of said lease and royalty conveyance. Ernest W. Reed was to contribute, and did contribute, the money to finance the undertaking, while M. F. Reed was "to get up testimony, witnesses," etc. Their understanding was that the attorneys' fees and expenses were to be deducted from

the recovery and the balance divided between themselves in the ratio of 60 per cent. to E. W. Reed and 40 per cent. to M. F. Reed. Later on, the Reeds induced the Lodens to allow them 50 per cent. of the recovery, and such an amount was, as between the Reeds, to be divided in the above ratio. The two Reeds having reached the above understanding, M. F. Reed, in accordance therewith, brought Ernest W. Reed in contact with the Loden proposition, and, as a result of the negotiations which followed, the Lodens executed a power of attorney, coupled with an interest direct to E. W. Reed, authorizing him to file suit to recover said lands and remove said cloud from the title. At this stage of the negotiations the Reeds had nothing but a potential possibility of recovering valuable mineral rights, and that involved serious litigation in which the services of an attorney were indispensable. So situated, the two Reeds entered into a contract with the plaintiff, R. L. Thompson, whereby they engaged his services to institute and prosecute such suit as was necessary to acquire and reduce to possession the rights granted by the Lodens in their contract. E. W. Reed, in behalf of himself and M. F. Reed, and in fact both, contracted to pay said Thompson on a contingent basis one-fourth of the 40 per cent. or some such amount of the possible recovery under the Loden contract. At this point it will be observed that the contract fixing the amount of attorneys' fee is not clear. The plaintiff's contention is that he was to have one-fourth of the 40 per cent. or 50 per cent. acquired by them from Lodens, and recovered by suit, and it is the defendants' contention that he was to have but 10 per cent. of any such recovery. These matters go to the merits of the case, and under proper pleadings the facts and issues relative to ambiguity, reformation, etc., will be developed and established at a trial on the merits. Hence we are not concerned with such issues in passing upon this plea of privilege, since it clearly appears that the case is one over which a district court has jurisdiction. Also under the testimony it is of no importance that the power of attorney was direct to E. W. Reed, or that he alone purports to have signed the written contract with Thompson.

Under the foregoing arrangement, the services of Thompson as an attorney were engaged, suit was filed in the district court of Upshur county, and thereafter moved to the federal court. Later the litigation was, by agreement of all interested parties, adjusted in that court upon the basis that the plaintiffs were to be paid $20,000, $10,000 of which was to be paid in cash, and a like amount in oil produced from the premises. A check for $10,000 was delivered by the defendant to Thompson and delivered by him to Ernest W. Reed, A. R. Loden and wife, to all of whom it was made payable. On delivery of the

check, Thompson claimed his fee according to his understanding; namely, $1,000, or a fourth of 40 per cent. of the total recovery going to the Reeds. The Reeds refused to pay this amount, and, after a consultation among themselves, and others apparently interested therein, the plaintiff, Thompson, was tendered a fee of $400 or 10 per cent. of the total interest of the Reeds. He rejected the same, and thereupon the instant suit followed.

On the trial of the plea, M. F. Reed denied that he sustained any contractual relations with Thompson on the matter of attorneys' fee. There are to be found conclusions in the testimony of both Reeds that the agreement as to attorneys' fee was exclusively between Thompson and E. W. Reed, and that all property rights in the contract evidenced by the power of attorney belonged exclusively to E. W. Reed, and that he (M. F. Reed) was merely working for a commission and without any interest otherwise in the subject-matter of the recovery. Such contention or conclusions we find to be without support in the testimony. Stripped of conclusions uttered by each of the Reeds, the facts detailed in the testimony established without controversy that the acquisition of the 40 per cent. interest in the Loden minerals was, as heretofore explained, either a partnership or a joint adventure, in which a portion of the same, or a percentage of recovery thereof, was contracted by the Reeds to be paid the attorney for his services—all of which, plus necessary expenses incident to such litigation, was to be deducted before the net thereof was to be divided between the Reeds in the ratio of 40 and 60 per cent.

As warrant for these conclusions, we again advert to the testimony of the Reeds, and especially the material facts related by M. F. Reed and left wholly undenied by Ernest W. Reed while on the witness stand.

M. F. Reed, being asked if he did not do practically all the "correspondence" and "everything" with reference to the Loden case, and that E. W. Reed constantly "consulted" him with reference thereto, testified: "He consulted me a good deal. You see, my agreement was that I was to get up the testimony, take care of the witnesses; he was to furnish the money and I was to line that stuff." Further questioned:

"You were out there talking that up. You had something worked out? A. Yes.

"Q. That it was a good piece of land there from an oil man's standpoint? A. Yes, very fine piece of land.

"Q. So soon as you found it you wired Bob Thompson here at Stephenville to advise you whether or not the people who had bought it later would be innocent purchasers or not? A. I think so. After I got the information on it and kind of blazed something out. * * *"

Being asked if he did not phone Bob Thompson (plaintiff) to come over to Gilmer and file the suit, the witness answered:

"I don't think I did. I told him to come over and see E. W. Reed, that I recommended him (Thompson) for this case; told him (E. W. Reed) to make the contract." (The words inserted in the parentheses indicate our interpretation of the testimony.)

"* * * Q. Well, now in the letter, after you were up there in St. Louis, you make this statement: 'Of course you will appear as attorney of record in the case.' You never had talked to Ernest W. Reed about it? A. About that case?

"Q. Yes. A. Yes, that contract was hard to get.

"Q. That was long before you phoned him from Dallas you say you recommended him, wasn't it? A. Well, let's see; that letter was * * * after the 18th. I phoned him about the 25th, I think. * * *

"Q. You made the statement in this letter: 'Now, I think by this time he has signed A. R. Loden on the eighty two acres that I wired you about, and of course you will show as attorney of record in that case.' You made that statement on it in your letter of June 11th? A. I am really inclined at this time that Mr. Reed had told Mr. Thompson he would hire him.

"Q. Then why did you tell Mr. Fulton that awhile ago in saying you recommended him? A. Of course I am not sure that he had; I knew he would and I phoned to Mr. Thompson that he could depend on it in coming over and signing."

Said Reed admitted that the plaintiff went to Gilmer in response to his telegram of June 12, 1931, which reads as follows: "Located eighty on Gregg County line but in Upshur County. Entirely surrounded by production. Lease and part royalty sold early—acknowledgment taken by Gregg County notary but all signed in Upshur. If is legal both lease and royalty changed hands since then. Can they claim innocent purchasers? Must I take it? Advise."

On the 14th he wrote the plaintiff the following letter:

"Dear Judge: The land I wired you about lies in Gregg and Upshur Counties as per map enclosed and trying to get it as hard as I can and think will land it and if I do will wire you and you can come down and file at once and incidentally I mean to handle this as I told you.

"It is only a few hundred feet from the Medge well and the same distance from the Edwards and by the time this reaches you will have a well 300 feet off. The owner is A. B. Loden the guardian we have been reading up on lately and this is his individual land. Got your papers O. K. and will file

them and report soon on the Bradshaw. Have draft now out on it."

Being asked the part E. W. Reed played in the transaction, M. F. Reed further testified:

"He consulted me a good deal, to see me about it; you see, my agreement was that I was to get up testimony, take care of the witnesses; he was furnishing the money and I was to line that stuff.

"Q. Did you go up to St. Louis at Mr. Thompson's suggestion? A. Yes. Now if you will let me, I will tell you why these contracts afterwards were put in E. W. Reed's name. I had already taken some in his name, for this reason: those people down there were strangers to me and didn't like to put this stuff in a stranger's name. I was representing Dr. Mulloy upon these, and with the understanding he was to pay me. Dr. Childress came back up here and told Dr. Mulloy about it; he thought it was so high priced, and wouldn't stand for any court cases. He said leave them out of any lawsuit. 'I sent you down there to buy leases and royalties.' He never sent me any more expense checks, and I never bought any more for him. I went on with Mr. Reed, then on my own hook, and he took care of the expense. I made the deals for him.

"Q. What kind of an agreement with reference to the Loden power of attorney contract did you have? A. I found that case down there. I found it was going to take quite a good deal of money to handle it. I didn't have the money, as alleged. I was quite insolvent. I am yet for that matter, and I knew that I couldn't handle it. I went to Mr. Reed there. I knew that he was able, or could be able, and I made him a proposition that I would take this in his name; I would take it in his name if he would hire all the attorneys, pay all expenses; after deducting all the expenses he was to pay me forty per cent for my services; pay all my expenses out of it as I went around there; I would furnish my car, for me to get up testimony, witnesses and all that kind of stuff."

On another occasion M. F. Reed reported to plaintiff, Thompson, concerning the lawsuit, as follows: "Weeks (another attorney engaged in the case) advises us that we have a very doubtful case and at the same time advises us to not settle for $30,000.00. I find that he can practice in any court and that ——— just made that tale up to discredit him. I am still ready to settle for $30,000.00 and so is the Doctor and Loden. I haven't consulted Mr. Reed in the matter, but feel that he is, too."

E. W. Reed, among other things, testified: "Mr. Reed, (M. F.) got 40% out of the transaction after all expenses and attorney's fees had been taken care of," and that he (E. W. Reed) got 60 per cent. of such balance. He also admitted having paid M. F. Reed's part to Dr. Childress, to whom it had been assigned by M. F. Reed.

When the interested parties were considering the plaintiff's demand according to his understanding of the contract, M. F. Reed refused to agree to the amount claimed by Thompson, and with reference to the same stated in his testimony: "I told him I wouldn't be willing for it to come out of my part of the commission I was getting to put them on, after having to pay for the whole contract." This witness' true interest in the subject-matter of the litigation is further indicated by another letter, written by him to the plaintiff, wherein he said: "Dear Judge: We went to Tyler last week to see Weeks. He says we may be six months getting a trial and is trying to arrange to take more depositions next Tuesday. I don't know what he wants to prove. The only witness that I can think of is the bank at Longview. It would be well to show that Turner had no funds at the time these drafts were issued or presented and outside of that we are foolish to put any more testimony on the stand for as we all know every time we show our hand they go hire a witness to swear something just the opposite so I am in favor of waiting till the trial for any new evidence."

[redacted] As before noted, there is nothing in the testimony of E. W. Reed that in any way runs counter to that of M. F. Reed, wherein the latter details the facts showing the true contracts between the Reeds and Lodens on the one hand and the Reeds and Thompson on the other. In fact, the material and uncontradicted testimony as contradistinguished from mere legal conclusions of a contrary import establishes the joint and several liability of the defendants as growing out of a partnership relation or that of joint adventure. Commonwealth Bank & Trust Co. v. Heid Bros., Inc. (Tex. Com. App.) 52 S.W.(2d) 74; Thompson v. Duncan, supra.

It follows that the venue of the suit was properly laid in Erath county under exception 4 to the general venue statute, article 1995, R. S. The case falls within the rule stated in Richardson v. Cage Co., 113 Tex. 152, 252 S. W. 747, and many Texas cases following that authority.

In reaching these conclusions, we are not concerned with exception 29a to the general venue statute (article 1995, Vernon's Ann. Civ. St.). That provision of the venue statute specially operates when suit is filed in a county which is not the residence of any defendant, but which may, nevertheless, be "lawfully maintained" in that county against at least one of the defendants. In such cases all necessary parties can be made defendants. Bender v. Arnstrong (Tex. Civ. App.) 59 S.W.(2d) 451; Empire Gas & Fuel Co. v. State (Tex. Sup.) 47 S.W.(2d) 265; Umberson v. Krueger (Tex. Civ. App.) 49 S.W.(2d) 528.

We sustain the propositions under consideration, and for the reasons assigned the judgment of the trial court is reversed and the cause remanded for a trial in the district court of Erath county. It is so ordered.